IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT, | ) ) ) ) | Civ. No. 04-0181-S-BLW |
| Plaintiff, | ) ) | |
| v. | ) ) | MEMORANDUM DECISION and ORDER |
| | ) | |
| K. LYNN BENNETT, Director Idaho State Office, Bureau of Land Management, et al., | ) ) ) ) | |
| | ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

## INTRODUCTION

The Court has before it motions filed by WWP (1) for injunction, (2) for

partial summary judgment, and (3) to file an amended complaint.  The Court also

has before it a motion to dismiss and motion to strike filed by the BLM, and a

motion to intervene.  The Court heard oral argument on May 17, 2005, and the

motions are now at issue.  For the reasons expressed below, the Court will grant

WWP's motions, deny the motions filed by the BLM, and grant in part the motion

to intervene.

**Memorandum Decision & Order – page 1**

## FACTUAL BACKGROUND

Plaintiff WWP challenges the BLM's issuance of grazing permits for allotments on the Jarbidge Resource Area.  WWP contends that the BLM's issuance of the permits was arbitrary and capricious under the Administrative Procedures Act (APA) because the BLM failed to follow the requirements of the National Environmental Protection Act (NEPA) and the Federal Land Policy and Management Act (FLPMA).

The BLM has divided the public lands it manages into administrative segments known as Resource Areas.  *See* 43 C.F.R. §  1601.0-5.  The Jarbidge Resource Area (JRA) comprises about 1.7 million acres of land in southern Idaho.  Congress has required that each Resource Area be governed by a Resource Management Plan.  *See* 43 U.S.C. §§ 1701-84.  The BLM manages the JRA according to the terms of the Jarbidge Area Resource Management Plan and its accompanying Environmental Impact Statement and Record of Decision (JRA RMP-EIS), completed in 1987.

To manage cattle grazing, the BLM has created grazing allotments that cover the entire JRA.  Recently, the BLM renewed ten-year grazing permits for 28 of these allotments, and it is that action that WWP challenges here.  WWP seeks to

**Memorandum Decision & Order – page 2**

halt the grazing to improve the condition of the rangeland.[1]

When the JRA RMP-EIS was issued in 1987, it described a bleak landscape. Only 16% of the rangeland was in "fair" or better condition, while 48% was in "poor" condition. *See* RMP-EIS Appendix Table F-2. Recognizing that grazing was part of the problem, the RMP ROD stated that "wildlife goals and watershed needs will be satisfied prior to allowing increases in livestock use." *See* RMP ROD at p. I-3.

In the same vein, the RMP ROD stated that increased grazing "would not be authorized unless monitoring studies indicate that the basic soil, vegetation and wildlife resources are being protected and additional forage is available." *Id*. at p. I-7. Consistent with this, the RMP-EIS directs that "[p]riority for habitat management will be given to habitat for listed and candidate Threatened, Endangered, and Sensitive species." *Id*. at p. II-87.

One of the sensitive species designated by the BLM in the JRA is the sage grouse. Sage grouse were "originally spread over most of the [JRA] area." *See* Simplot EA at p. 3-58. More recently, however, the BLM has observed that their numbers have declined dramatically: "Over the last 20 to 50 years there has been

---

[1] On two other allotments, Inside Desert and Poison Butte, the BLM had not issued a Final Grazing Decision at the time of the argument and hence those two allotments are not at issue here.

**Memorandum Decision & Order – page 3**

an 85% reduction in the number of sage grouse male attendance at known leks . . . and a subsequent overall population reduction." *Id*.  The number of occupied leks "decreased 37% over the last 20 to 50 years." *Id*.  The causes of this decline include "overgrazing of sagebrush habitats," along with wildfires, habitat fragmentation, drought, invasion of exotic plants, and conversion of sagebrush habitat to agriculture. *Id*.

The alarming decline of the sage grouse is occurring at the same time that the BLM is documenting problems with the JRA rangeland.  Since 1999, the BLM has determined that all 28 of the grazing allotments at issue here fail to meet the ecological standards of the Fundamentals of Rangeland Health (FRH). *See* 43 C.F.R. § 4180.1 (2003).  These regulations set minimum criteria for the condition of environmental resources, requiring, for example, that watersheds and riparian areas be in proper functioning condition, *id*. at § 4180.1(a), that water quality meets legal standards, *id*. at § 4180.1(c), and that adequate habitat is being maintained for wildlife, *id*. at § 4180.1(d).

For example, after examining 14 allotments – designated as Crawfish, Three Creek, Antelope Springs, Cedar Creek, Pigtail Butte, Kubic, Flat Top, Clover Crossing, Echo Clover, Brackett Bench AMP, Noh Field, North Fork Field, Winter Camp, and Desert 71 – the BLM determined that for each, (1) FRH standards were

**Memorandum Decision & Order – page 4**

not being met and (2) livestock grazing practices were a significant factor in the failure to meet those standards.

Despite the deterioration of these 14 allotments caused by grazing, the BLM has approved increased grazing on 9 of these allotments, and approved maintaining the past level of grazing on the other five.  No reductions in grazing are planned.

On a 15th allotment – Juniper Butte – the BLM found FRH violations and concluded that grazing was a factor in those violations although the BLM could not determine if it was a significant factor.[2]  The BLM approved an increase in grazing on this allotment.

On another 13 allotments – Brown's Gulch, Yahoo, Echo Jewett, Bruneau Hills, Echo 4, Echo 5, Camas Slough, Coonskin, East Juniper Draw, Grassy Hills, Blackrock Pocket, Cedar Butte/Devil Creek, and Hallelujah – the BLM found FRH violations but concluded that grazing was not a significant factor in those violations.  For 11 of these allotments, the BLM has approved an increase in grazing while for the remaining 2 allotments, the BLM approved maintaining grazing at past levels.

---

[2]  In the Brown's Gulch EA, the BLM notes that in some cases it was "difficult for the Interdisciplinary (ID) team to determine if current or historic livestock grazing was the cause [of FRH violations].  In this instance, livestock grazing was listed as a factor but was not called a significant factor in not meeting the [FRH] Standard."  *See EA Dated May 1, 2003*, at Ch.1, p. 13.

**Memorandum Decision & Order – page 5**

Before making final decisions on whether to re-issue ten-year permits for these 28 allotments, the BLM assessed the environmental impacts of grazing in Environmental Assessments (EAs).  The BLM decided to do four EAs, because the 28 allotments were divided among four permittees.  The four EAs are known as (1) the RCI EA, (2) the Simplot EA, (3) the Brown's Gulch EA, and (4) the Echo 5 EA.

Because three of the four permittees held permits for widely-separated allotments, three of the EAs evaluated allotments that were quite a distance apart from one another.  For example, the RCI EA evaluated two allotments in the southwest corner of the JRA, and two others at least 15 miles away in the northeast corner.  The Brown's Gulch EA evaluated allotments separated by over 15 miles. The eighteen allotments evaluated in the Simplot EA are scattered randomly throughout the entire JRA.

On the basis of the four EAs, the BLM issued Final Grazing Decisions renewing the ten-year permits for each of the allotments.  Each of the Final Grazing Decisions contained a similar finding that the issuance of the permits would not constitute a major federal action that would significantly affect the quality of the human environment, and hence no Environmental Impact Statement (EIS) would be necessary.

WWP filed this lawsuit alleging among other things that the Final Grazing Decisions violate NEPA and FLPMA.  WWP has now moved for partial summary judgment on both of these claims, and seeks to enjoin any grazing on these 28 allotments.  The BLM has filed a motion to dismiss, and various ranching entities have filed motions to intervene.  The Court will turn first to the BLM's motion to dismiss and then review the NEPA issues.[3]

## ANALYSIS

### 1.    BLM's Motion to Dismiss

The BLM argues that WWP has failed to exhaust its administrative remedies.  The Court disagrees.  WWP filed with the BLM three timely motions to stay and one untimely motion.  The BLM denied all four motions.   WWP has no further administrative remedies to pursue and thus has satisfied the exhaustion requirement.

The BLM responds that its new regulations require WWP to file a "timely" motion to stay in order to satisfy the exhaustion requirement.  However,

---

[3]  The BLM asserts that the Amended Complaint does not challenge the Brown's Gulch EA and that this failure bars WWP from challenging that EA in this case.  WWP has moved to file a Second Amended Complaint that clearly does make that challenge, and the Court will grant that motion under the liberal provisions of Rule 15.  The parties had a full opportunity to brief all the issues regarding the Brown's Gulch EA, and did so.  Thus, there is no prejudice to defendants.

if that is how the regulation reads, it sets up roadblocks beyond those approved in *Darby v Cisneros*, 509 U.S. 137 (1993) and hence cannot be applied to WWP.

**2.    NEPA Standard of Review**

WWP challenges the BLM's decision, contained in the Final Grazing Decisions, to not prepare an EIS.  An agency's decision not to prepare an EIS under NEPA is reviewed under the APA's arbitrary and capricious standard.  *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146 (9th Cir. 1998).  In determining whether the BLM's decision was arbitrary and capricious, the Court must ask whether the agency has taken a "hard look" at the environmental consequences of its proposed action.  *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1211 (9th Cir. 1998).  Under this deferential standard, the Court will affirm an agency's decision that is "fully informed and well-considered."  *Id.*  However, the Court "must not 'rubber-stamp' . . . administrative decisions that [it] deem[s] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute."  *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 858 (9th Cir. 2005).

**3.    NEPA Requires Public Input**

NEPA regulations describe the EA as a "concise public document."  *See* 40 C.F.R. § 1508.9.   The regulations tell agencies that "public scrutiny [is]

**Memorandum Decision & Order – page 8**

essential." 40 C.F.R. § 1500.1(b).  Accordingly, agencies are charged to

"encourage and facilitate public involvement in decisions," *id*. § 1500.2(d), so that

"environmental information is available to public officials and citizens before

decisions are made."  *Id*. § 1500.1(b).

The Ninth Circuit has read these regulations to mean that "the public must

be given an opportunity to comment on draft EAs and EISs."  *Anderson v. Evans,*

371 F.3d 475, 487 (9th Cir. 2004).  Because the regulations "must mean

something," the Circuit has held that an agency's failure to obtain any public input

on a draft EA "violates these regulations."  *Citizens for Better Forestry v. U.S.*

*Dept. of Agriculture*, 341 F.3d 961, 970 (9th Cir. 2003).

Here, the BLM obtained no public input on the draft Simplot and RCI EAs

before issuing the Final Grazing Decisions based on those EAs.  That failure

violates NEPA under the Ninth Circuit case law cited above.

## 4.    NEPA Requires Cumulative Impacts Analysis

The EA must contain a cumulative impact analysis.  *Kern v. U.S. BLM*, 284

F.3d 1062, 1075 (9th Cir. 2002).  A "cumulatively significant impact" is an impact

on the environment that results from "the incremental impact of the action when

added to other past, present, and reasonably foreseeable future actions regardless of

what agency . . . or person undertakes such other actions."  *Id.*  Cumulative impacts

**Memorandum Decision & Order – page 9**

can result from individually minor but collectively significant actions taking place over a period of time. *Ocean Advocates*, 402 F.3d at 868.

Moreover, in considering cumulative impacts, an agency must provide "some quantified or detailed information; . . . [g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Id*. This cumulative analysis "must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects." *Id.*

In this case, the cumulative impacts analysis required by NEPA was especially important. The four EAs examined almost half of the JRA – their analysis covered about 800,000 acres of the 1.7 million acre JRA. Yet, as discussed above, each EA analyzed widely separated allotments. The BLM decided that each EA would analyze only the allotments grazed by a single permit holder. Those holders often held permits for allotments many miles apart. The result was that the four EAs analyzed grazing impacts over a huge swath of land in a patchwork-quilt manner that was not driven by any environmental imperative.

By choosing this mode of analysis, the BLM was in danger of "dividing a project into multiple 'actions,' each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Native*

*Ecosystems Council v. Dombeck*, 304 F.3d 886, 894 (9th Cir. 2002).  The only way the BLM could avoid this problem would be to engage in a detailed cumulative impacts analysis.

It failed to do so.  The only cumulative impact analysis in each EA read as follows:

> The analysis did not identify any known significant cumulative or secondary effects (EA Section IV Environmental Consequences). Outside this project area, additional Standards and Guidelines Assessments, determinations and subsequent decisions will be made, potentially resulting in changes in livestock management actions, stocking levels and seasons of use.  However, those actions in combination with this decision are not cumulatively significant impacts.

*See Final Grazing Decision for Simplot Allotments dated July 21, 2004,* at p. 5.

This is just the type of perfunctory analysis criticized in *Ocean Advocates*. A much more detailed cumulative impact analysis was required because (1) the 28 allotments being evaluated comprised almost half of the JRA; (2) the population of a sensitive species, the sage grouse, was in steep decline in the JRA; (3) the BLM's own analysis identified grazing as a factor in the decline of the sage grouse; (4) FRH violations exist on all 28 allotments at issue; (5) the proposed action – the renewal of the grazing permits – would authorize an increase in overall grazing; and (6) the EAs were, like a horse with blinders, hampered by a restricted field of

**Memorandum Decision & Order – page 11**

vision.[4]

Indeed, these six factors require not only that the BLM conduct a more detailed cumulative impacts analysis, but also that it conduct that analysis in a single document. NEPA requires that the "analysis be done in a single document when the record raises 'substantial questions' about whether there will be 'significant environmental impacts' from the collection of anticipated projects." *Klamath-Siskiyou Wildlands Center v. Bureau of Land Management*, 387 F.3d 989, 999 (9th Cir. 2004); 40 C.F.R. § 1508.25(a)(3) (directing that actions with "similarities that provide a basis for evaluating their environmental consequences together" should be evaluated in a single evaluation).

Here, the six factors listed above certainly create "substantial questions" about whether the "collection of anticipated projects," *i.e.*, the re-issuance of permits for 28 allotments, will have a significant environmental impact on the JRA. There is a substantial question regarding the linkage between grazing, FRH violations, and the decline of a sensitive species. Moreover, each is widespread – the grazing, the FRH violations, and the sage grouse decline are not limited to isolated pockets of the JRA, but are rather spread throughout its reach. When the

---

[4] This decision will later refer back to these six factors. To avoid repeating them, the decision will simply reference them as "the six factors."

**Memorandum Decision & Order – page 12**

environmental consequences are spread so widely, only a comprehensive review can accurately evaluate the true impacts.  Under the Ninth Circuit authority cited above, the BLM must combine the NEPA analysis into a single study.

The BLM argues that "this case is about the significant increase in forage production on the [JRA] that has occurred over the last 30 years . . . ."  *See BLM Brief* at p. 1.  The BLM estimates that "in some areas, forage has increased approximately 300% following the seeding of crested wheatgrass."  *Id*. at p. 2.

Yet despite this increased forage, all 28 of the allotments at issue have FRH violations, and the sage grouse is in steep decline.  While the increase in forage is beneficial, it is a means to an end – a means of curing FRH violations and stemming declines in wildlife populations – not the end itself.

The BLM also notes that according to recent BLM studies, 94% of the JRA is in "Fair" to "Excellent" condition, a vast improvement over the 24% existing in 1987.  *Id*. at p. 14.[5]  This study was conducted by Patricia Courtney, a Range Technician for the BLM.  She reached these conclusions after studying 15 allotments.  *See Courtney Declaration* at ¶ 3, p. 2.

The Court has three concerns with this study.  First, it covers just over half

---

[5]  The new designations for "Fair," "Good," and "Excellent" are, respectively, "Mid-Seral," "Late Seral," and "Potential Natural Community."

**Memorandum Decision & Order – page 13**

of the 28 allotments at issue here.  Second, it studies only small samples of certain

pastures within those 15 allotments.  Third, its results appear inconsistent with

broader studies in the record.

For example, Courtney studied sites in the East Juniper Draw, 71 Desert, and

Bruneau Hills allotments to reach her conclusion that the rangeland was improving

in 2002-2003.  *Id.*  However, the BLM's own studies in 2002 of these three

allotments cast doubt on Courtney's conclusions.

In 2002, the BLM conducted an Allotment Assessment for each of these

three allotments.  Attached to each of those Assessments is a one-page document

entitled Allotment Summary Sheet.  It contains a summary of the total acres in

Poor, Fair, Good, and Excellent condition.

For the East Juniper Draw allotment, 78% of the allotment was in Poor

condition, 22% was in Fair condition, and no acres were in Good or Excellent

condition.  *AR at 203695.*  The Summary Sheet for the 71 Desert allotment was

much the same: 74% in Poor condition, 8% in Fair condition, and no acres in Good

or Excellent condition.  *AR at 102847.*  Consistent with these findings, the Bruneau

Hills Summary Sheet shows 66% of its acres in Poor condition, 34% in Fair

condition, and no acres in Good or Excellent condition.  *AR at 201876.*

These figures indicate very little has changed since the bleak assessment of

**Memorandum Decision & Order – page 14**

the JRA EIS-RMP in 1987.  This analysis is only confirmed by the decline of the

sage grouse and the continuing FRH violations.

There are also asserts that each Final Grazing Decision specifically

addressed the FRH violations and proposed mitigation measures for the specific

allotments being reviewed.  That is certainly a step in the right direction.  From the

Court's review of the record, it is apparent that the BLM and its Interdisciplinary

Team have worked hard to craft mitigation measures for each allotment.  The

Court certainly does not mean to denigrate those efforts.  However, even the BLM

does not argue that the mitigation measures will be immediately effective.  In the

interim, grazing is increasing, putting increased pressure on the rapidly declining

sage grouse population.

There is also a real question about the whether the mitigation measures will

actually be implemented.  For example, the BLM states in the Simplot EA that an

"optimum level" of a crucial mitigation measure – monitoring – "would be

dependent on funding."  *See Simplot EA* at p. 2-6.[6]

Most importantly, however, the BLM's incremental allotment-by-allotment

approach leaves it unable to answer a simple, yet crucial, question:  What is the

_____

[6]  While the Simplot EA was prepared by a private company, Dynamic Corporation, the
BLM essentially adopted it in the Final Grazing Decision dated July 21, 2004.

**Memorandum Decision & Order – page 15**

cumulative environmental impact of increasing grazing on 21 of 28 allotments in the face of widespread FRH violations and a dramatic decline of a sensitive species?  That question cannot be answered because nobody has looked at the big picture here.

The BLM argues that grazing is not being increased, and is in fact reduced by 8% in the Final Grazing Decisions.  The BLM arrives at this figure by comparing the grazing levels approved in the Final Grazing Decisions with the actual grazing levels a year earlier.

The problem with this analysis is that the BLM has authorized past grazing increases by issuing Temporary Nonrenewable Permits (TNRs) without complying with NEPA or FLPMA.  If the grazing levels authorized by the Final Grazing Decisions in the 28 allotments at issue are compared with the last levels authorized by a NEPA document, grazing has increased by 83%.  That is the most accurate comparison in a NEPA review.  The BLM's comparison, in contrast, begins with a blind acceptance of years of TNR grazing increases that were never properly evaluated.  The Court therefore rejects the BLM's argument that grazing has dropped by 8%.

**5.**     **Conclusion on Sufficiency of EAs Under NEPA**

The Court finds that the BLM violated NEPA (1) by failing to consider the

impacts in a single NEPA document and (2) by failing to conduct a meaningful

cumulative impacts analysis.  Because of this, the decision of the BLM to issue

permits on the 28 allotments at issue here was arbitrary and capricious under the

APA.

This finding raises two issues.  First, if the BLM is to prepare a single

analysis, should it be an EA or an EIS?  Second, is WWP entitled to injunctive

relief pending completion of the NEPA study?  The Court will turn to the first

question immediately, and will answer the second question after resolving the

FLPMA claim.

## 6.    <u>Is an EIS Required?</u>

NEPA requires that an environmental impact statement (EIS) must be

prepared for every "major federal action significantly affecting the quality of the

human environment."  42 U.S.C. § 4332(2)(C).  If an agency decides not to prepare

an EIS, it must supply a "convincing statement of reasons" to explain why a

project's impacts are insignificant.  *Blue Mountains*, 161 F.3d at 1212.  "The

statement of reasons is crucial to determining whether the agency took a 'hard

look' at the potential environmental impact of a project."  *Id.*

To prevail on a claim that an agency violated its statutory duty to prepare an

EIS, a "plaintiff need not show that significant effects will in fact occur."  *Id.*  It is

enough for the plaintiff to raise "substantial questions whether a project may have a significant effect" on the environment. *Id.*

In making this determination, the Court relies on NEPA regulations, promulgated by the Council on Environmental Quality ("CEQ"), to guide the review of an agency's determination of "significance." *See* 40 C.F.R. § 1508.27. Whether there may be a significant effect on the environment requires consideration of two broad factors: "context and intensity." *See* 40 C.F.R. § 1508.27; 42 U.S.C. § 4332(2)(C).  Context refers to the setting in which the proposed action takes place. *Id*. at § 1508.27(a).  Intensity means "the severity of the impact." *Id*. at § 1508.27(b).

These regulations contain a non-exclusive list of ten factors that the Court may consider in determining the intensity issue.  The Circuit has held that one of these factors may be sufficient to require preparation of an EIS in appropriate circumstances. *Ocean Advocates v. U.S. Army Corp of Engineers*, 402 F.3d 846 (9th Cir. 2005).

### A.    <u>Uncertainty</u>

One of the "intensity" factors is "[t]he degree to which the possible effects on the human environment are highly uncertain . . . ."  40 C.F.R. § 1508.27(b)(5). "Preparation of an EIS is mandated where uncertainty may be resolved by further

**Memorandum Decision & Order – page 18**

collection of data or where the collection of such data may prevent speculation on potential . . . effects.  The purpose of an EIS is to obviate the need for speculation . . . ."  *Ocean Advocates*, 402 F.3d at 870.

Even assuming the accuracy of the BLM's assertions, this case presents substantial uncertainties.  The BLM asserts that forage has increased substantially, yet widespread FRH violations continue.  The BLM asserts, in Courtney's study, that the rangeland condition has dramatically improved, yet the sage grouse population continues to decline.  These startling contrasts arise even under the BLM's view of the case, and create substantial uncertainties as to the environmental effects of increasing (or maintaining) grazing over nearly half of the JRA.  This factor therefore favors an EIS.

### B.    <u>Reasonable Anticipation of Cumulatively Significant Impact</u>

Another factor in evaluating "intensity" is whether "the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment."  40 C.F.R. §  1508.27(b)(7).  This language makes it clear that the Court need not find that cumulatively significant impacts actually exist so long as it is "reasonable to anticipate" that they exist.  Certainly the six factors

satisfy this anticipation test, and thus this factor also supports the preparation of an EIS.

### C.    Conclusion on Significance and the Need for an IRS

The discussion above shows that the intensity of the proposed action raises substantial questions about whether it is significant.  While questions regarding one of the factors may be enough to trigger the preparation of an EIS, *Ocean Advocates, supra,* here there are substantial questions regarding two of the factors. The Court therefore finds that the BLM must prepare an EIS that will evaluate the re-issuance of permits on the 28 allotments at issue here.

### 7.    FLPMA

FLPMA directs the BLM to develop and maintain comprehensive Resource Management Plans (RMPs) that govern all aspects of public land management, including grazing administration.  43 U.S.C. § 1712 (2000).  Grazing permits must be consistent with RMPs.  43 U.S.C. §  1732(a); 43 C.F.R. §  1601.0-5(b), 4100.0-8.  RMPs constrain grazing permits by determining where grazing will or will not be allowed and by setting environmental standards that all grazing permits must meet.  *See id*. § 1732(a) (requiring management "in accordance with the [RMPs]"); *id*. § 1752(c)(1) (conditioning renewal of grazing permits on lands remaining available for grazing in accordance with RMPs).

**Memorandum Decision & Order – page 20**

As discussed above, the BLM manages the JRA pursuant to the JRA RMP-EIS. That document is designed to order priorities, and it clearly places wildlife interests ahead of grazing increases: "[W]ildlife goals and watershed needs will be satisfied prior to allowing increases in livestock use." *See* RMP-ROD at p. I-3. To drive home this point, the JRA RMP-EIS states that increased grazing "would not be authorized unless monitoring studies indicate that the basic soil, vegetation and wildlife resources are being protected and additional forage is available." *Id*. at p. I-7. If any doubt remained, it was clarified by the direction that "[p]riority for habitat management will be given to habitat for listed and candidate Threatened, Endangered, and Sensitive species." *Id*. at p. II-87.

The BLM argues that these provisions merely list discretionary guidelines rather than mandatory requirements. The Court disagrees. The plain language of the provisions speaks in terms of requirements, not suggestions. For example, the JRA RMP-EIS does not suggest that priority for habitat management "may" be given to habitat for Sensitive species – rather, it requires that such priority "will" be given.

The BLM also argues that the land use plan provisions are not enforceable under *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004). That case, however, dealt with claims that an agency had failed to act, while this case

involves agency action that is inconsistent with the land use plan.  On that point, *Norton* stated that agency action inconsistent with the plan "can be set aside as contrary to law pursuant to 5 U.S.C. § 706(2)."  *Id*. at 65.

There is no doubt that the sage grouse, a sensitive species, is in rapid decline, and that FRH violations exist on all the allotments.  Under these circumstances, the JRA RMP-EIS requires the BLM to ensure that wildlife protection takes priority over increases in grazing levels.

The BLM argues that it did act to protect wildlife by adopting Management Guidelines in the EAs that approved the increased grazing levels.  The Court disagrees for two reasons.

First, these Guidelines are discretionary.  The title "Guidelines" demonstrates that they are goals, not requirements.  As an example, one Guideline suggests that monitoring should be done, but then qualifies that by noting that the "optimum level" of that monitoring "would be dependent on funding."  *See Simplot EA* at p. 2-6.  This is not a mandatory mitigation measure.  Moreover, the actual grazing practices are changed year-to-year in the Annual Grazing Plans for each permit without public input.  Thus, a requirement one year could be downgraded to a mere suggestion the next.

Second, the Guidelines have been adopted without the monitoring required

by the JRA RMP-EIS.  The monitoring requirements are triggered by the decline in a sensitive species combined with continuing FRH violations.  Yet the Allotment Assessments show that for many allotments where the BLM has found FRH violations caused by livestock grazing, the BLM has failed to do any monitoring for sensitive species.

For example, the BLM has approved an increase in grazing for the Cedar Creek, Pigtail Butte, Flat Top, Noh Field, North Fork Field, Winter Camp, and Desert 71 allotments.  For each of these allotments, as discussed above, the BLM has found FRH violations, and found that grazing is a significant factor in those violations.  The BLM has also found on each of these allotments that "[a] number of species presently designated as sensitive species are present in the allotment." *See, e.g., Allotment Assessment for 71 Desert Allotment* at p. 12.

All of these findings require, under the JRA RMP-EIS, that the BLM conduct monitoring for sensitive species before approving increased grazing. However, that monitoring has not been done.  Each of the Allotment Assessments for the allotments listed above contain an identical statement that "for the most part, the allotment has not been inventoried for sensitive species." *Id.*  Moreover, this failure may continue in the future since, as discussed above, an "optimum level" of monitoring "would be dependent on funding."  *See Simplot EA* at p. 2-6.

**Memorandum Decision & Order – page 23**

For all of these reasons, the Court finds that the BLM has violated FLPMA's consistency requirement – that is, the requirement that the agency's action (the BLM's approval of the grazing permits) be consistent with the land use plan (the JRA RMP-EIS). The Court will therefore grant WWP's motion for partial summary judgment on its fifth claim for relief.

## 8.   <u>Injunctive Relief</u>

A moving party is entitled to a preliminary injunction if it demonstrates that it is likely to succeed on the merits and may suffer irreparable injury, or that serious questions exist on the merits and the balance of hardships tips in its favor. *See Self-Realization Fellowship Church v. Ananda*, 59 F.3d 902, 913 (9th Cir. 1995). The two tests are not separate but represent a sliding scale in which the required probability of success on the merits decreases as the degree of harm increases. *Id.* "Under any formulation of the test, the plaintiff must demonstrate that there exists a significant threat of irreparable injury." *Oakland Tribune, Inc. v. Chronicle Publishing Co.,* 762 F.2d 1374, 1376 (9th Cir.1985).

In the NEPA context, "irreparable injury flows from the failure to evaluate the environmental impact of a major federal action." *High Sierra Hikers Assoc. v. Blackwell*, 390 F.3d 630, 641 (9th Cir. 2004). While an injunction does not automatically issue upon a finding that an agency violated NEPA, "the presence of

**Memorandum Decision & Order – page 24**

strong NEPA claims gives rise to more liberal standards for granting an injunction." *Id.*  If environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment.  *Id.*

Here, serious environmental concerns are arrayed against substantial commercial interests.  The same dilemma was faced in *High Sierra.*  There, the district court had to determine whether commercial packers in two wilderness areas should be enjoined from operating while the Forest Service completed an EIS.  The court "crafted a fair and balanced injunction that provided for interim relief for the environment pending compliance with NEPA and did not drastically curtail the packers' operations." *Id.*  at 642-43.

This Court used a somewhat similar balancing approach in *Western Watersheds v. Rosenkrance*, Civ. No. 04-443-E-BLW, Memorandum Decision issued May 6, 2005.  There, the Court gave the parties time to try to reach an agreement on injunctive relief rather than imposing such relief immediately.

This case, however, is different from *Rosenkrance*.  There, the Court was faced with NEPA violations.  Here, the Court is faced with not only violations of NEPA, but also violations of FLPMA and, according to the BLM's own findings, violations of the FRH regulations.  These violations occur simultaneously with the decline in the population of a sensitive species, another factor not present in

**Memorandum Decision & Order – page 25**

*Rosenkrance*.

These circumstances require the immediate issuance of an injunction.  The Court will therefore enjoin all grazing on the 28 allotments at issue until a single EIS is completed and a Record of Decision or Final Grazing Decision is rendered thereon.[7]

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motions for partial summary judgment (docket nos. 72 & 81) filed by plaintiffs are GRANTED.

IT IS FURTHER ORDERED, that the motion for preliminary injunction (docket no. 86) filed by plaintiffs is GRANTED and that all grazing is hereby enjoined on the 28 allotments at issue here in the Jarbidge Resource Area until the BLM completes a single comprehensive EIS on the 28 allotments and a Record of Decision or Final Grazing Decision is rendered thereon.

IT IS FURTHER ORDERED, that the motion to dismiss (docket no. 97) is DENIED.

IT IS FURTHER ORDERED, that the motion to strike (docket no. 99) is

---

[7] With regard to the motion to intervene, the Court will, consistent with past decisions, permit the intervention for remedy purposes only.  With regard to the BLM's motion to strike WWP's declarations on the ground that this case is limited to the administrative record, the Court did not rely on those declarations in any way and will therefore deny the motion.

**Memorandum Decision & Order – page 26**

DENIED.

IT IS FURTHER ORDERED, that the motion to intervene (docket no. 100) is hereby GRANTED IN PART AND DENIED IN PART.  It is granted to the extent it seeks intervention for remedy purposes but is denied for all other purposes.

IT IS FURTHER ORDERED, that the motion to file Second Amended Complaint (docket no. 102) is GRANTED and the Clerk of the Court is directed to file the Second Amended Complaint.

DATED:  **July 29, 2005**

B. LYNN WINMILL
Chief Judge
United States District Court