IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT, | ) ) ) | Civ. No. 04-0181-S-BLW |
| Plaintiff, | ) ) ) | |
| v. | ) ) | MEMORANDUM DECISION AND ORDER |
| K. LYNN BENNETT, et al., | ) ) ) | |
| Defendants. | ) ) | |

**INTRODUCTION**

The Court has before it WWP's motions to reopen this case, to allow the
filing of a supplemental complaint and for Rule 60(b) relief, and for a preliminary
injunction.  The Court heard oral argument on April 30, 2008, and took the
motions under advisement.  For the reasons discussed below, the Court will allow
the case to be reopened – and a supplemental complaint to be filed – only as to the
36 allotments not governed by the Stipulated Settlement Agreement.  In addition,
the Court will grant the motion for Rule 60(b) relief only in part, ordering the BLM

**Memorandum Decision & Order – page 1**

to engage in certain mandatory monitoring methods discussed below, but denying the motion in all other respects.

## ANALYSIS

The Court has issued prior decisions in this case fully reciting the facts. The Court will presume the reader has a full knowledge of those facts, and will only review what is necessary to resolve the motions at issue here.

**1.** **Court's 2005 Decision**

On August 1, 2005, the Court issued a decision enjoining grazing on 28 allotments in the Jarbidge Resource Area (JRA) until the BLM prepared an EIS evaluating the re-issuance of grazing permits on those 28 allotments. The Court found both NEPA and FLPMA violations. With regard to NEPA, the Court held that the record raised substantial questions regarding grazing's contribution to the poor condition of the range and the dramatic decline of a sensitive species, the sage grouse.

FLPMA required that the BLM manage the JRA consistently with the JRA-RMP. That document clearly placed wildlife interests ahead of grazing increases. *See RMP-ROD* at p. I-3 ("wildlife goals and watershed needs will be satisfied prior to allowing increases in livestock use"); p. I-7 (stating that increased grazing "would not be authorized unless monitoring studies indicate that basic soil,

**Memorandum Decision & Order – page 2**

vegetation and wildlife resources are being protected and additional forage is available"). These provisions are requirements, not suggestions. The BLM's continued authorization of grazing – and the increased grazing it allowed on 21 of the 28 JRA allotments – violated FLPMA under these circumstances.

On the basis of the NEPA and FLPMA violations, the Court enjoined grazing on the 28 allotments until the BLM completed an EIS and Record of Decision evaluating the issuance of the 28 grazing permits. The intervenors filed a motion for reconsideration, arguing that the injunction swept too broadly because many of the pastures in the 28 allotments were in good condition.

**2.      Stipulated Settlement Agreement**

Before the motion to reconsider was heard, the parties – including eleven intervenor/ranchers – entered into extensive negotiations that eventually resulted in a Stipulated Settlement Agreement (SSA). The SSA governed 28 allotments in the JRA. In the SSA, the parties agreed that the BLM would prepare a revised JRA RMP and supporting EIS, and that based on the results of this comprehensive NEPA review, the BLM would issue site-specific NEPA reviews and ten-year grazing permit decisions for all JRA allotments. The Court approved the SSA on October 20, 2005, and entered an Order modifying its earlier-filed injunction to reflect the settlement terms.

**Memorandum Decision & Order – page 3**

The SSA provided that the revised JRA RMP was to be completed by September 30, 2009.  The BLM has stated that it is on schedule for completion by that date.  In the interim, the SSA imposed a general set of requirements for each allotment, known as Interim Grazing Management Conditions.  The SSA further provided that more specific conditions would be imposed by Annual Grazing Plans that must be issued for each allotment prior to the turnout of any cattle for that grazing season.  *See SSA* at ¶ 29.  The Annual Grazing Plans (AGP) include Animal Unit Months (AUMs), Management Guidelines, and Pasture Specific Guidelines.  *See Crane Declaration* at ¶ 8.

3.     **Interim Grazing Management Conditions & AGPs**

The Interim Grazing Management Conditions that governed each of the 28 allotments covered by the SSA were negotiated by all the parties and set forth in detail in the SSA.  For many of the allotments, the Conditions were obtained from the BLM's Rangeland Health Determinations (RHDs) and Final Decisions for those allotments.

The RHDs would examine the pastures that make up an allotment.  While some allotments contain a single pasture, others contain multiple pastures.  The RHDs examine each pasture in a particular allotment, and make a determination (1) how that pasture measures up to eight different standards (watersheds, riparian,

**Memorandum Decision & Order – page 4**

stream channels, native plants, seedings, exotic plants, water quality, and threatened, endangered, and sensitive species), (2) if any particular standard is not met, whether significant progress is being made toward compliance, and (3) whether livestock grazing is a significant factor in any failure to meet a standard. The RHDs were conducted between 2002 and 2004.

For example, the Brackett Bench allotment contains seven pastures (North, Whiskey Slough, Indian Cave, Corral Creek, Meadow, Brown's Creek & China Creek). The RHDs for the Brackett Bench allotment examined all seven pastures. For two of the pastures (Indian Cave and Corral Creek), the BLM found either that the standards were being met, or, if not, that there was significant progress toward attainment and livestock grazing was not a significant factor in non-attainment.

For the other five pastures in the Brackett Bench allotment, the BLM found that some standards were not met and that livestock grazing was a significant factor in the non-attainment. For example, in both the Meadows and Brown's Creek pastures, the BLM found that two standards (Riparian & Stream Channel functioning) were not met, and that livestock grazing was the cause. Accordingly, the BLM imposed grazing management practices for these two pastures designed to improve pasture conditions. The North pasture failed to attain three standards (watersheds, native plants, and seedings), and the Whiskey Slough pasture failed to

**Memorandum Decision & Order – page 5**

attain two standards (watershed & native plants), all due to livestock grazing.  The findings as to China Creek are somewhat confusing, since the BLM at one point finds violations caused by livestock grazing and then retracts that, although in the end, the BLM imposed numerous management practices on the pasture as if it was in non-attainment.  At any rate, China Creek is being rested from grazing in the 2008 season.

On each of these allotments where violations were found to be caused by grazing, the BLM imposed management practices on the grazing in these pastures designed to correct the failures identified in the RHDs.  These management practices were carried forward into the SSA Interim Grazing Conditions and the AGPs that govern grazing each season.  The 2008 AGPs for the Brackett Bench allotment authorize spring grazing (from April 1 to June 20, a period when sage grouse are nesting, which will be discussed more below) in three of the pastures (North, Whiskey Slough, and Indian Cave) but not in the other four pastures (Corral Creek, Meadow, Brown's Creek, & China Creek).

To ensure that the restrictions continued to improve conditions, the parties agreed in the SSA to mandatory monitoring of each allotment by the BLM.  *See SSA* at ¶ 30.  Finally, to focus resources on range improvement rather than litigation, each side gave up some legal rights:  WWP agreed to give up its rights to

**Memorandum Decision & Order – page 6**

appeal the BLM's determinations or begin new litigation over these 28 allotments, and the intervenors agreed to give up any right they may have to avoid the BLM's determinations by using legislative "riders." The parties also agreed "that each will give prior notice and confer to attempt to resolve any dispute over the implementation of this [SSA] before seeking any intervention of the court." *See SSA* at ¶ 46.

**4.      Analysis of the Management Situation**

In March of 2007, in accordance with the SSA, the BLM issued its Analysis of the Management Situation (AMS) for the JRA-RMP.[1] The AMS was a compilation of the BLM's field research done to prepare the JRA RMP. It reports that between 1982 and 2006, the JRA lost 800,000 acres of native sagebrush-steppe habitat – the habitat used by the sage grouse. Of the 44 allotments studied, 28 failed to meet some Rangeland Health Standards, with livestock grazing being a significant factor in the non-attainment. *See AMS* at p. 178. The AMS found that "current habitat [for the sage-grouse] is highly fragmented throughout the northern two-thirds of the [JRA]," and noted a study that found sage grouse had lower nesting success in fragmented habitats when compared with contiguous habitats.

---

[1]  While the report is dated July of 2007, it is undisputed that it was actually issued in March of 2007.

**Memorandum Decision & Order – page 7**

*see AMS* at p. 151.  The AMS concluded that the primary cause of the loss of sage

grouse habitat was wildfires, noting that "numerous large wildfires since the 1970s,

and subsequent rehabilitation, resulted in millions of acres of sagebrush steppe

converted into grasslands . . . ."  The AMS also found that grazing, along with its

associated water developments and fencing, is also causing destruction of sage-

grouse habitat.

**5.**   **Murphy Complex Fire**

About four months after the AMS was issued, the JRA was hit with a

catastrophic wildfire that burned 425,815 acres, destroying 70% of the remaining

sage-grouse nesting habitat and over 80% of the known occupied pygmy rabbit

habitat.  Both animals have been designated as sensitive species by the BLM.  The

pygmy rabbit has been recommended for listing under the ESA, and the sage

grouse in presently under consideration for listing (this Court having earlier struck

down a decision finding that listing was not warranted).

Within just a few weeks, the BLM responded by implementing the Murphy

Complex Fire Emergency Stabilization and Rehabilitation Plans.  These plans

proposed substantial amounts of seedings, weed treatments, soil stabilization

treatments, fencing and monitoring.  Over 500,000 acres will be closed, with

grazing to resume only when, among other things, (1) total ground cover is greater

**Memorandum Decision & Order – page 8**

than 80% of what is expected on the range site, (2) over 50% of desired herbaceous perennial plants are producing seed, and (3) monitoring indicates that the entire plant community has developed root systems sufficient to provide soil stabilization and withstand grazing when soils are moist.

The dispute here is over the fencing and monitoring provisions of these plans.  The Rehabilitation Plan proposes repairing 390 miles of pre-existing fences damaged by the fire at an estimated cost of $1.6 million.  These fences are primarily located in the interior of the fire-damaged area, which is not currently being grazed.  The Stabilization Plan proposed another 103 miles of "protective fencing" to protect seeded areas "while allowing appropriate use of other, unburned areas."  *See BLM Brief* at p. 9.

## 6.   **WWP's Rehabilitation Plan**

According to WWP's expert, Dr. Braun, the extensive loss of sagebrush habitat in the Murphy Complex Fire, coupled with the existing poor condition of the range, "will cause female sage-grouse to now have significant challenges in seeking adequate habitat for nesting (laying eggs and incubation) and brood rearing."  *See Braun Declaration* at p. 8.  This will, according to Dr. Braun, significantly reduce breeding success in coming years, until native habitats are restored (including establishment of sagebrush of sufficient height and maturity to

**Memorandum Decision & Order – page 9**

provide adequate nesting cover, which may take many years).  *Id*.

Dr. Braun recommends that if grazing is allowed at all, it must be (1) limited to the periods between June 20 and August 1 (so that grazing is not occurring during the spring sage-grouse nesting season) and November 15 and March 1 (when plant growth has ceased for the year); and (2) monitored to ensure that use of herbaceous forage is limited to 25-30% of annual production to improve vegetation to meet the habitat needs of sage grouse.  *Id*. at p. 6.   WWP's other expert, Stuart Murray, also states that spring grazing (April 1 to June 20) should be banned because this period is the "critical nesting time for sage grouse . . . ." *See Murray Declaration* at p. 15.

To focus on the allotments that are of particular importance to sage grouse, WWP's expert Amy Haak evaluated which areas still had sufficient levels of habitat to warrant protection as a priority area.  Under Haak's analysis, a pasture was included as a priority area if it was within the lek concentration areas and was at least 10% sagebrush, or contained at least 25 acres of sagebrush habitat connected to one of the three remaining large patches of sagebrush (greater than 50,000 acres).  On the basis of this study, Haak selected 57 allotments as being "of particular importance to sage-grouse" and further refined her analysis to select certain pastures within those allotments as "priority pastures."  *See Haak*

**Memorandum Decision & Order – page 10**

*Declaration* at pp. 20-24.

It is on these 57 allotments that WWP seeks to enjoin all grazing and fence building.  Of these, 21 are included in the SSA, while 36 are non-SSA allotments.  WWP seeks to halt all grazing and fence building on the 57 allotments.  The Court will consider first the 21 allotments covered by the SSA.

**7.   21 SSA Allotments**

The SSA – signed by the parties and approved by the Court – is a private contract, and enforceable as such.  *See Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989).  Each party agrees to "extinguish those legal rights it sought to enforce through litigation in exchange for those rights secured by the contract."  *Id.* (quoting *Miller v. Fairchild Industries, Inc.,* 797 F.2d 727, 733 (9th Cir. 1986)).  Settlement agreements are not contrary to public policy; rather, public policy "wisely encourages settlements," *see McDermott, Inc. v. AmClyde*, 511 U.S. 202, 215 (1994), and strongly favors enforcement of settlement agreements.  *Jeff D.*, 899 F.2d at 759.

WWP signed the SSA and is bound by its terms.  In the SSA, WWP agreed that until the RMP was completed, grazing would be managed according to the interim grazing conditions described in the SSA and the AGPs issued prior to each season's turn-out.  WWP agreed not to file new litigation so that the BLM could

**Memorandum Decision & Order – page 11**

focus its resources on preparing the RMP.  WWP's attempt now to file a supplemental complaint and seek broad injunctive relief is in direct conflict with both the letter and the spirit of the SSA.

WWP argues, however, that the SSA expressly allows it to seek relief under Rule 60(b).  Under that Rule, WWP must satisfy the initial burden of showing a significant change either in factual conditions or in the law warranting modification of the decree.  *See U.S. v. Asarco Inc.,* 430 F.3d 972, 979 (9th Cir. 2005).  This Court must then determine whether the proposed modification is suitably tailored to resolve the problems created by the changed factual or legal conditions.  *Id.*  In particular, "[i]f the movant cites significantly changed factual conditions," as WWP does here, "it must additionally show that the changed conditions make compliance with the consent decree more onerous, unworkable, or detrimental to the public interest.  *Id.* (internal quotations omitted).  A court should not ordinarily modify a decree, however, "where a party relies upon events that actually were anticipated at the time it entered into a decree."  *Id*.

Here, wildfires were anticipated.  The Clover Fire was raging while the SSA was being negotiated, and WWP expressly agreed to "all management actions imposed by BLM as a product of the Clover Fire *or any other events that may occur* during the Interim Grazing Management Plan period . . . ."  *See SSA* at ¶ 34.

**Memorandum Decision & Order – page 12**

The italicized phrase is broad enough to cover not only other fires, but even much larger fires, like the Murphy Complex Fire.  All sides were aware that wildfire was not only a constant threat, but also had been identified as the single worst threat to sage grouse habitat.  To adopt WWP's reading, the Court would have to rewrite the provision as follows:  "*or any other events that may occur so long as they are fires no larger than those of the past.*"  The Court refuses to so rewrite the provision. As drafted by the parties, the obvious intent behind the provision is to avoid substituting the Court as a crisis manager for the BLM every time a fire sweeps through the area, no matter how large.

WWP argues that it is nevertheless entitled to Rule 60(b) relief because the BLM has failed to use the monitoring methods made mandatory by the SSA. Specifically, WWP argues that the BLM is failing to abide by the SSA's requirement that monitoring must measure utilization of native bunchgrass plant communities by using the Height-Weight methodology described in Interagency Technical Reference 1734-3, *Utilization Studies and Residual Measurements*.  The BLM argues that this is not a requirement, and that the agency is free to conduct its monitoring by using other utilization standards.

The Court must interpret the SSA.  In this task, the Court gives no deference to the BLM's interpretation under *Chevron, U.S.A., Inc. v. Natural Resources*

**Memorandum Decision & Order – page 13**

*Defense Council, Inc.,* 467 U.S. 837 (1984) because the SSA is a Court-approved settlement agreement, not a regulation or statute within the BLM's area of expertise.  *See generally*, *The Wilderness Society v. U.S.F.W.S,* 353 F.3d 1051 (9th Cir. 2003) (en banc).

To interpret the SSA, the Court will pick one allotment – the Brackett Bench allotment – as an example because it is typical of many other allotments.  The SSA states that the Brackett Bench allotment is "subject to the following requirements: . . . the Management Guidelines set forth in Table 3 . . . ."  The Management Guidelines and Table 3 are set forth in the Final Decision for this allotment, which governs grazing in each pasture in the Brackett Bench allotment.  For 6 of the 7 pastures, Table 3 shows that Management Guideline No. 1 applies in those pastures.  That Guideline states that "[u]tilization would be conducted based on the Height-Weight methodology described in Interagency TR 1734-3, *Utilization studies and Residual Measurements*."

The SSA states that not only is monitoring mandatory, but also that "the methods for monitoring stated therein" are mandatory.  The "methods for monitoring" 6 of the 7 pastures on the Brackett Bench allotment require that utilization of native bunchgrass plant communities be measured by using the Height-Weight methodology described in Interagency Technical Reference 1734-3.

**Memorandum Decision & Order – page 14**

Thus, for every pasture governed by Management Guideline No. 1, the SSA makes it mandatory for the BLM to monitor utilization of native bunchgrass plant communities using the Height-Weight methodology described in Interagency Technical Reference 1734-3.  Accordingly, WWP's interpretation prevails.  The BLM is breaching the SSA by using other monitoring methods in those pastures governed by Management Guideline No. 1.

It does not necessarily follow, however, that WWP is entitled to Rule 60(b) relief.  *Asarco* holds that relief is only appropriate if the BLM's breach renders performance of the SSA "onerous, unworkable, or detrimental to the public interest."  *Asarco*, 430 F.3d at 979.  That would certainly be the case if the BLM was ignoring its monitoring obligation altogether.  Such conduct would destroy a basic premise of the SSA and render it unworkable or detrimental to the public interest.  But the record shows that the BLM is conducting monitoring, albeit by a different method.  Rule 60(b) relief might still be warranted if the BLM's monitoring is so inferior that it is producing utilization results substantially different from those achieved using the SSA's mandatory methods.  The record does not support such a finding, however, because the Court was not provided with any comparison of results.  Accordingly, the Court will simply order the BLM to follow the SSA monitoring methods from this point onward.

**Memorandum Decision & Order – page 15**

For all these reasons, the Court will deny WWP's motion to reopen the case, motion to file supplemental complaint, and motion for injunctive relief as to the 21 allotments governed by the SSA.  The Court will grant in part WWP's motion for Rule 60(b) relief, ordering the BLM to follow the monitoring method discussed above, but denying the motion in all other respects.

**8.    36 Allotments Not Governed by the SSA – Jurisdictional Issues**

The Court now turns its focus to the 36 allotments designed as priority sage grouse habitat by WWP and not governed by the SSA.  The Court will first resolve the jurisdictional challenges raised by the defendants.

To obtain judicial review under the APA, WWP must challenge a final agency action. See 5 U.S.C. § 704.  On all the allotments under consideration, the BLM has either authorized grazing in 2008 or ordered that no grazing take place. Either way, the BLM has issued a final decision concerning grazing, imposing legal consequences for the violation of those decisions.  That is sufficient to render the BLM's action as "final agency action" under the APA.  *ONDA v. U.S. Forest Service*, 465 F.3d 977, 983 (9th Cir. 2006) (holding that annual grazing decisions were final agency action).

WWP was not required to exhaust its administrative remedies by appealing the BLM's decisions.  This Court has previously held in this case that the

**Memorandum Decision & Order – page 16**

exhaustion requirement is only applicable when regulations require it and render inoperative the challenged decision during the appeal. *See Darby v. Cisneros*, 509 U.S. 137 (1999). Here, the regulations neither require exhaustion nor render the decisions inoperative during an appeal. Hence WWP need not exhaust its administrative remedies before filing suit here.

The defendants argue that the grazing rider contained in Section 325 of the 2004 Interior appropriations bill waives environmental laws and precludes any injunctive relief. The Court earlier rejected a similar argument regarding Temporary Nonrenewable Permits under Section 142 of the same bill. Both riders contain identical language that renewals are issued pursuant to "Section 402 of [FLPMA] and section 3 of the Taylor Grazing Act . . . ." These sections require, in FLPMA's terms, that permit issuance be "consistent with the governing law." *See* 43 U.S.C. § 1752(a). Furthermore, Section 325 states that "[n]othing in this section shall be deemed to alter the statutory authority of the Secretary of the Interior . . . ." The Court previously rejected the argument that such riders divest this Court of jurisdiction to apply FLPMA, and the Court reaffirms that decision here.

The Court therefore finds that it has jurisdiction over WWP's claims as to the 36 allotments not covered by the SSA, and that the action is properly before

**Memorandum Decision & Order – page 17**

this Court.  Given the liberal provisions of Rule 15, and this Court's prior order on

reopening the case, the Court will grant WWP's motion to reopen, and the motion

to amend, as to the 36 allotments not covered by the SSA.  The Court will turn now

to resolve WWP's motion for injunctive relief.

**9.      WWP's Motion to Enjoin Grazing and Fencing on 36 Allotments**

        While WWP seeks to enjoin all grazing or fence building on 36 non-SSA

allotments, its expert Amy Haak has identified "priority pastures" within the 36

allotments that only consist of a portion of the total number of pastures within

those allotments.  The Court reads into her analysis that the pastures not so

identified do not contain sage grouse habitat.  If WWP is seeking relief on all

pastures within the 36 allotments, its request sweeps too broadly because it

provides no support for the finding that every pasture has sage grouse habitat that

needs protection.  At most, WWP may seek injunctive relief as to those pastures so

identified by Haak.

        For many of these pastures, it appears that no Rangeland Health

Determination (RHD) analysis has been done.  *See Sixth Schweigert Affidavit.*  For

two others (Inside Desert and Poison Butte), the BLM did find RHD violations

caused by grazing, but management changes were implemented by the BLM as

directed by Magistrate Judge Williams, who was presiding over litigation

**Memorandum Decision & Order – page 18**

involving these two allotments. The record does not reveal the result of these improved practices.

Nevertheless, WWP is seeking to enjoin grazing and fence building on all these pastures, whether RHD violations occur thereon or not.  WWP's concern is that the Murphy Fire Complex has triggered a habitat crisis requiring a broad cessation of grazing and fence building without regard to whether individual pastures are in compliance with RHD criteria.

Given the degraded condition of the range, and the fire's unprecedented destructive effects, there is a crisis in habitat for the sage grouse, pygmy rabbit, and slickspot peppergrass.  The situation is akin to a home burning down.  If the fire department failed to respond, someone on site would need to take charge, however ill-prepared to handle such a crisis.  However, if the firemen are actively engaged in putting out the fire, a bystander's attempt to take charge would only endanger everyone.

Here, the firemen are fully engaged – the BLM has taken emergency action through its Stabilization and Rehabilitation Plans, while at the same time it is devoting extensive resources to preparing the RMP.  This Court has previously stressed the crucial importance of habitat for these sensitive species, and the BLM appears fully committed to the Court's direction.

**Memorandum Decision & Order – page 19**

A crisis requires special expertise.  The Court is reluctant to accept WWP's invitation to take over management of this crisis from the BLM when it appears that the BLM recognizes the severity of the problem.  Moreover, the Court is being asked to enjoin grazing on pastures despite not knowing the condition of many of them.  WWP's broad attack seeks not an pasture-by-pasture review but a wholesale management change.  The Court is really being asked to step out of its role as a reviewer of discrete agency action and become a crisis manager.

For all of these reasons, the Court will deny WWP's motion for injunctive relief at this time.  The Court will, however, allow WWP to re-file its motion and schedule an evidentiary hearing to pursue relief.  As is evident from the Court's discussion above, the Court needs a more detailed record as to the condition of the pastures sought to be kept off-limits from grazing and fencing.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion to reopen (docket no. 152) is GRANTED IN PART AND DENIED IN PART.  It is granted to the extent it seeks to reopen this case to resolve a challenge to grazing on 36 allotments not governed by the SSA.  It is denied in all other respects.

IT IS FURTHER ORDERED, that the motion to file supplemental complaint

**Memorandum Decision & Order – page 20**

and for Rule 60(b) relief (docket no. 153) is GRANTED IN PART AND DENIED

IN PART.  It is granted to the extent it seeks (1) the filing of a supplemental

complaint to allege a challenge to grazing on 36 allotments not governed by the

SSA; and (2) an order that the BLM follow the monitoring methods discussed

above.  It is denied in all other respects.

IT IS FURTHER ORDERED, that the motion for preliminary injunction

(docket no. 155) is DENIED without prejudice to WWP's right to re-file the

motion and schedule an evidentiary hearing to pursue relief.

DATED:  **May 8, 2008**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision & Order – page 21**