# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>STEVEN ELLIS, Director, Idaho State Office, Bureau of Land Management; RICK VANDERVOET, Jarbidge Field Manager, BLM; BUREAU OF LAND MANAGEMENT, an agency of the United States,<br><br>　　　　Defendants. | Case No. CV 04-181-S-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it a motion to set aside judgment filed by the ranchers/intervenors. The Court held an evidentiary hearing and took the motion under advisement, allowing counsel additional time to file briefing. Those briefs were received on June 27, 2011, and the matter is now at issue. For the reasons explained below, the Court will grant the motion in part, and modify its prior total ban on grazing to allow for grazing under certain conditions.

## LITIGATION BACKGROUND

In 2005, the Court enjoined grazing on 28 allotments in the Jarbidge Resource Area (JRA). The ranchers/intervenors who graze these allotments now seek to modify

**Memorandum Decision & Order - 1**

that injunction on the ground that a total ban is no longer equitable. The Court's injunction banning grazing was based in large part on the failure of all 28 allotments to meet the Fundamentals of Rangeland Health (FRH) standards. The BLM had determined that livestock grazing was a "significant cause" of the failure to meet FRH standards. The Court's ban on grazing was to last until the BLM had completed an EIS on the 28 allotments.

After the Court issued its injunction in 2005, the parties entered into extensive negotiations. They eventually signed a Stipulated Settlement Agreement (SSA). In the SSA, the parties agreed that grazing could continue on the 28 allotments governed by Interim Grazing Management Plans (IGMPs). The intent behind the IGMPs was to place conditions on grazing to improve conditions. In addition, the SSA provided that the BLM would conduct monitoring and inventory assessment to assure compliance with the IGMPs. The Court approved the SSA.

In the SSA, the BLM agreed to prepare a revised JRA Resource Management Plan and supporting EIS, and then conduct site-specific NEPA reviews and issue ten-year grazing permits for all JRA allotments (not just the 28 allotments governed by the SSA terms). The Court administratively terminated the case as the BLM continued to work on the new JRA RMP and EIS.

In July of 2007, one of the largest wildfires in our Nation's history burned over 400,000 acres in the JRA, destroying 70% of sage grouse habitat. The fire prompted WWP to file a motion to reopen this case to (1) strike down the SSA and enjoin grazing

**Memorandum Decision & Order - 2**

once again on those 28 allotments, and (2) to enjoin all grazing on an additional 36 allotments. The Court refused to strike the SSA and so it continued to govern the 28 allotments. With regard to the additional 36 allotments, a trial was set to determine whether it was necessary to enjoin grazing on those allotments.

Following that trial, in February of 2009, the Court refused to enjoin grazing on the 36 non-SSA allotments. Relying on a team of experts, the BLM had closed many areas to grazing and immediately started rehabilitation projects in other areas. These actions, the Court found, showed that a fully engaged BLM was doing all it could in a crisis situation.

By the end of the grazing season in 2010, the IGMPs expired by their own terms. The parties were not able to reach agreement on an extension, and the Court denied a motion to impose the terms on the parties, holding that the issue must be raised by a motion under Rule 60(b). The injunction banning all grazing on the 28 allotments came back into place as the IGMPs expired. *See Memorandum Decision (Dkt. 430)*

The ranchers/intervenors responded by filing a motion to modify the injunction under Rule 60(b)(5). The Court held a day-long evidentiary hearing on June 15, 2011, and took the motion under advisement.

## LEGAL STANDARD

Rule 60(b)(5) authorizes this Court to "relieve a party or its legal representative from a final judgment, order, or proceeding [when] applying it prospectively is no longer equitable." To modify the Court's injunction, Simplot bears the burden of showing that a

**Memorandum Decision & Order - 3**

"significant change in circumstances warrants revision." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 383 (1992). This is done by "showing either a significant change . . . in factual conditions or in law." *Id.* at 384.

This standard has been described as "flexible." *Jeff D. v. Kempthorne*, 365 F.3d 844, 854 (9th Cir. 2004). A "flexible approach allows courts to ensure that 'responsibility for discharging the State's obligations is returned promptly to the State and its officials when the circumstances warrant.'" *Horne v. Flores*, 129 S.Ct. 2579, 2593 (2009) (quoting *Frew v. Hawkins*, 540 U.S. 431, 442 (2004)).

A judgment may be modified when changed circumstances make compliance with the old decree "more onerous, unworkable, or detrimental to the public interest." *U.S. v. Asarco, Inc.*, 430 F.3d 972, 979 (9th Cir. 2005). But the mere inconvenience of "liv[ing] within the terms" of a judgment is an insufficient demonstration of changed circumstances. *Rufo*, 502 U.S. at 383.

Once a court has determined that changed circumstances warrant a modification, "the focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances." *Id.* at 391. "A court should do no more, for a . . . final judgment [should] be reopened only to the extent that equity requires." *Id.* However, "once a party carries this burden, a court abuses its discretion 'when it refuses to modify an injunction . . . in light of such changes.'" *Horne v. Flores*, 129 S.Ct. 2579, 2593 (2009) (quoting *Agostini v. Felton,* 521 U.S. 203, 215 (1997)) (other internal citations omitted).

**Memorandum Decision & Order - 4**

# ANALYSIS

Conditions in the JRA for the sage grouse, a candidate species under the Endangered Species Act, have not improved since 2005. Their habitat has been destroyed by wildfire and their numbers are dropping. Richard Vander Voet, the BLM's Jarbidge Field Office Manager, noted that the population counts are "discouraging." *See Vander Voet Declaration (Dkt. 423)* at ¶ 71, p. 27. Dr. Clint Braun, a recognized expert on the sage grouse, testified at the hearing that there has been a "drastic decrease" in the sage grouse population and that the population is "collapsing." Dr. Braun testified that nesting cover – that is, sagebrush cover that hides sage grouse as they lay their eggs – was very poor generally. In his many years of experience, he had never seen so many "depredated" eggs – that is, eggs that had been damaged or destroyed by predators.

Whether the decline of sage grouse numbers is described as "drastic" or "discouraging," the experts on both sides agree that the decline is due largely to the destruction of habitat by wildfire. But opinions diverge on the effect of a total ban on grazing in the area. Dr. Braun emphasized the need to protect the relatively small islands of remaining sage steppe habitat, and to increase nesting cover and forbs. The best way to do that, he believed, was by banning grazing.

Vander Voet, however, testified that the total ban on grazing was hampering his ability to manage the main risk to sage grouse – fire. He testified that managed grazing could reduce the fuel load and at least slow down wildfires. He also testified that the ban makes its difficult to plan multi-year grazing rotations between pastures. There is a

**Memorandum Decision & Order - 5**

patchwork of private and state land holdings within these allotments – and just outside their boundaries – that are not subject to the injunction. The ban on BLM land prevents Vander Voet from using grazing rotation among pastures as a tool to reduce grazing's impact, and also makes it difficult for him to work with state and private land managers on joint conservation projects.

The gist of Vander Voet's testimony was that the injunction is interfering with the BLM's energetic management of the 17 allotments. That was not the case when the injunction was put into place in 2005. At that time, the Court confronted allotments that had been ravaged by grazing that was not subject to vigorous control. Today, the situation is much different.

The BLM is engaged in both monitoring and inventory activity – that is, the agency is taking inventory of the resources in these allotments and also monitoring trends in key indicators. *See Vander Voet Third Declaration (Dkt. 423)* at ¶¶ 12, 29. Vander Voet discusses vegetation conditions on the 17 allotments on a "pretty much daily" basis "at this time of year" with the BLM's staff, including "botanists, fish biologists, and riparian aquatic people" among others. *See Transcript (Dkt. 498)* at pp. 18-19. With regard to the sage grouse, Vander Voet testified that his staff "have conducted sage-grouse habitat assessments throughout the [Jarbidge] Field Office during the last two years." *See Vander Voet Third Declaration* at ¶ 35, p. 13. As part of its monitoring activities, the BLM has been monitoring compliance with the IGMP conditions. In the SSA allotments, with respect to grazing after August 1 and before December 1,

**Memorandum Decision & Order - 6**

"monitoring data at key sites in sagebrush pastures consistently show that average grazing utilization levels are less than 30%." *See Vander Voet Third Declaration* at ¶ 18, p. 6. That usage level leaves adequate herbaceous heights for the next grazing season according to the testimony of Dr. Braun in an earlier hearing. *See Memorandum Decision (Dkt. 201)* at p. 10.

The Court has discussed in past decisions the BLM's fire rehabilitation plan. Vander Voet testified that the plan was working and that "we're very pleased with both the natural recovery as well as how the landscape treatments have come in, particularly the seedings." *See Transcript* at p. 20. The rehabilitation plans for the 2010 fires "include multiple actions specifically aimed at protecting and restoring sage-grouse and slickspot peppergrass habitat." *See Vander Voet Third Declaration, supra* at ¶ 89, p. 34.

With regard to the slickspot peppergrass, a listed species under the ESA, "the Jarbidge Field Office has performed over 25,000 acres of Slickspot peppergrass habitat inventory" over the past 5 years. *Id*. at ¶ 36, p. 13. The BLM has also imposed Management Guidelines on the only allotment that contains slickspot peppergrass – the Juniper Butte allotment – that are designed to protect that listed species of plant. Those Guidelines ban grazing from February 1 to March 31, which is the most probable time for saturated soils where cattle trampling could destroy slickspot. *Id*. at ¶ 20, p. 7. Wet soils are also likely in the period between April 1 and June 1, and the Management Guidelines require no more than 20% utilization, and the use of rotation grazing management to limit "livestock hoof impact." *Id*. In addition, in 2006, the BLM stopped its practice of issuing

**Memorandum Decision & Order - 7**

crossing permits allowing cattle to trail through slickspot habitat in the Juniper Butte allotment. *Id*. at ¶ 23, pp. 8-9. Perhaps most importantly, Vander Voet testified that "[m]onitoring results over the past five years confirm that BLM and the permittee have complied with the SSA in the Juniper Butte allotment. *Id*. at ¶ 21, p. 8.

This evidence leads to two conclusions. First, the BLM is committed to protecting the habitat of the listed species in the JRA to a degree not apparent to the Court when it issued the injunction in 2005. Second, a total ban on grazing would interfere with the BLM's ability to use the best science to manage grazing.

At the same time, the sage grouse numbers are declining and their habitat is disappearing. Grazing is clearly an important cause of this decline. While fire has leapt to the top of the list of the causes of the decline, that just makes the remaining habitat all the more critical and in need of protection, as Dr. Braun testified. Grazing could hasten the destruction of these islands of habitat.

This testimony establishes that the threat posed by grazing to listed species – an irreparable harm – remains sufficiently likely that some injunctive relief is necessary. *See Winter v. NRDC*, 129 S.Ct. 365 (2008). However, the Court is convinced, especially after hearing the testimony of Vander Voet, that the BLM's commitment to rigorous management of grazing, along with its monitoring and inventorying activity, will improve conditions. A total ban on grazing will interfere with the BLM's efforts, by contributing to a buildup of fuel, preventing pasture rotations, and hampering joint conservation efforts.

**Memorandum Decision & Order - 8**

Given the continuing threats to listed species caused by grazing, a complete lifting of the injunction is not warranted. But the significant changed circumstances – that is, the vigorous management by the BLM – makes a total ban inequitable, and warrants a modification of the injunction. There comes a time when a significant change of circumstances warrants, under Rule 60(b)(5), returning to the agency the "responsibility for discharging [the agency's] obligations . . . ." *Horne*, 129 S.Ct. at 2595. That time has arrived.

Once a court has determined that changed circumstances warrant a modification, "the focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances." *Rufo,* 502 U.S. at 391. "A court should do no more, for a . . . final judgment [should] be reopened only to the extent that equity requires." *Id.*

The Proposed Order submitted by the permittees and the BLM would have the Court order the BLM to, among other things, (1) implement the IGMPs for each permittee until the BLM issues the final Record of Decision on the new RMP, (2) ensure that all wildlife goals and watershed needs are satisfied prior to allowing increases in livestock use within the 17 allotments, (3) impose as part of the IGMPs a grazing ban from March 1 to June 1 (the sage grouse breeding and nesting period) on certain allotments every other year, (4) impose on the IGMPs for certain allotments grass residual stubble height restrictions, (5) allowing permittees to do riparian monitoring when the BLM cannot do so; (6) consult with WPP and the Idaho Department of Fish and Game before issuing

**Memorandum Decision & Order - 9**

Annual Grazing Plans, and (7) provide annual reports to the Court as to the implementation of the IGMPs. *See Proposed Order (Dkt. 431-1).*

The Court finds that the proposed order generally – but not entirely – meets the test of *Rufo* that it be tailored to do no more than equity requires. The Court is troubled by a few of the provisions that require more scrutiny.

### Riparian Monitoring

One provision of the proposal assigns riparian monitoring to the permittees "should the BLM be unable or unwilling to complete such monitoring." *Id*. at p. 3. The Court disagrees with this provision. It is critical that a disinterested party conduct all monitoring and inventory activity. The Court's overall decision here relies heavily on the finding that the BLM is not a captive agency doing the bidding of the permit holders. Allowing the regulated party to monitor its own conduct would reduce the strength of that assumption and could lead to a different result. Accordingly, the Court will not permit riparian monitoring to be farmed out to the permit holders. If the BLM becomes unable to conduct its monitoring and inventory activities due to budget constraints – a real possibility in this political climate – the Court would need to revisit this decision.

### Spring & Winter Grazing

WWP also alleges that the BLM is allowing grazing during critical times while sage grouse are mating and nesting in contravention of the recommendations of Dr. Braun. In the Court's earlier Findings of Fact and Conclusions of Law, the Court relied on Dr. Braun to make the following finding:

**Memorandum Decision & Order - 10**

> To avoid conflicting with sage grouse mating, nesting and brood rearing, grazing should be limited around leks and nests to (1) periods between June 20 and August 1 (so that grazing is not occurring during the mating and nesting seasons discussed above) and between November 15 and March 1 (when plant growth has ceased for the year).

*See Findings of Fact and Conclusions of Law (Dkt. 363)* at ¶ 245, p. 52. These standards, WWP argues, are being violated, and to support this argument, WWP filed the Declaration of Kenneth Cole, who prepared charts from BLM documents showing the times and locations of grazing on the 17 allotments for each year since 2006. *See Second Declaration of Cole (Dkt. 481).*[1] For example, one chart shows that on the Crawfish allotment, the permit holder grazed cattle in the North pasture during the spring in 2006, 2007, and 2010. *See Exhibit 2 (Dkt. 481-2)* at p. 1. The grazing in 2006 and 2007 was roughly from May through June, while the grazing in 2010 included April, May and a little more than half of June. *Id.* These months – April, May and early June – are typically times when sage grouse are nesting and should not be disturbed by grazing, according to Dr. Braun. But the North pasture of the Crawfish allotment has only a small amount of Key Sage Grouse Habitat (KSGH), *see Exhibit 2020,* and much of it appears to be contained in a parcel of State property within the allotment boundaries. *See Exhibit 2019.* The vast majority of the allotment has no KSGH, and there is no testimony that sage grouse nesting is taking place there.

---

[1] The defendants have moved to strike this, and other submissions or in the alternative to be allowed to file rebuttal material. The Court will deny the motion to strike and grant the right to file rebuttal material that is attached to the motion.

**Memorandum Decision & Order - 11**

An allotment with a much greater amount of KSGH is the Cedar Creek allotment. Within that allotment, on the Monument Springs pasture, the permit holder grazed cattle from mid-July through mid-to-late October in 2007, 2009, and 2010. This grazing is not occurring during mating or nesting season, which is proper given the large concentration of KSGH in that allotment and that particular pasture. *See Exhibit 2013 (showing the Monument Springs pasture to be almost completely filled with KSGH).* The grazing is occurring during the time of plant growth, which could be a problem. However, there is testimony from Vander Voet that the BLM is monitoring vegetation in these allotments on a regular basis and adjusting the grazing restrictions to what they see on the ground. He testified that the permit holders were following the restrictions set forth by the BLM.

There has, however, been grazing during the nesting season in the Lake pasture of the Coonskin allotment. *Exhibit 2, supra*, at p. 2. About half the area of that pasture contains KSGH. *See Exhibit 2018.* The grazing that took place on the Lake pasture in 2010 was from April 11th through June 16, a period that includes about two weeks of the sensitive nesting season. *Exhibit 2, supra* at p. 2. The two years prior – in 2008 and 2009 – the pasture was rested, and in 2007, the grazing took place after the standard nesting season. But in 2006, there were about two weeks of grazing during the standard nesting season. *Id*.

These three examples are representative of the rest of information provided by Cole's charts. The Court is concerned about the pattern of grazing during sensitive times for the sage grouse on pastures containing large amounts of KSGH. In answer to this, the

Memorandum Decision & Order - 12

BLM points to Vander Voet's testimony that (1) the BLM is regularly monitoring the grazing and vegetation levels, and (2) the permit holders are following all BLM restrictions. As another answer, the permittees point to the condition contained in their proposed modified injunction that a grazing ban be imposed on certain allotments, every other year, from March 1 to June 1.

The Court finds both answers insufficient. The threats to sage grouse habitat are simply too severe to allow wide-spread grazing during sensitive times on allotments filled with precious KSGH. The allotments that contain high amounts of KSGH include (1) Antelope Springs, *see Exhibit 2003*; (2) Brackett Bench, *see Exhibit 2008*; (3) Cedar Creek, *see Exhibit 2013*; (4) Juniper Butte, *see Exhibit 2031*; (5) Pigtail Butte*, see Exhibit 2038*; (6) Seventy-One Desert*, see Exhibit 2040*; and (7) Three Creek #8*, see Exhibit 2042*.[2]

The permittees proposed order calling for a ban on grazing during the mating and nesting season every other year in certain allotments does not sufficiently protect the sage grouse during this sensitive time. Mating and nesting may take place in certain pastures in successive years, and so granting the BLM authority to ban grazing only "every other year" would allow grazing to interfere with mating and nesting at certain times.

Instead, the Court's injunction will grant full authority to the BLM to ban or restrict grazing without limitation, consistent with law. Moreover, the Court will direct

---

[2]Obviously, this may change over time, and the BLM's monitoring will be important in tracking these changes.

the BLM to give extra scrutiny to grazing restrictions and outright bans for certain pastures containing key sage grouse habitat during the periods between June 20 and August 1 (mating and nesting season), and between November 15 and March 1 (when plant growth has ceased for the year). The Court is confident the BLM is already taking this step, but will make the BLM's authority to do so explicit in this injunction.

## Conclusion

The Court will therefore grant in part the motion to set aside the total ban on grazing in the 17 allotments at issue. The Court will keep the injunction in place, but lift the total ban on grazing, and require that grazing follow certain conditions set out in more detail below.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion to set aside judgment (docket no. 431) is GRANTED IN PART AND DENIED IN PART. It is granted to the extent it modifies the total ban on grazing to the extent set forth below. It is denied in all other respects.

IT IS FURTHER ORDERED, that all grazing is enjoined on the following allotments in the Jarbidge Field Office (Bruneau Hill, Flat Top, Echo 5, Clover Crossing, 71-Desert, Blackrock Pocket, Juniper Butte, Crawfish, Three Creek #8, Coonskin, Noh Field, E. Juniper Draw, Pigtail Butte, Cedar Creek, Antelope Springs, Brackett Bench, and N. Fork Field) that does not comply with the following terms and conditions.

**Memorandum Decision & Order - 14**

(1) <u>IGMPs</u>: The BLM shall prepare for each permit holder an Interim Grazing Management Plan (IGMP) to govern grazing on these allotments. Those IGMPs shall be designed to

    (a)    maintain or enhance existing and potential populations of the sensitive species, and

    (b)    to ensure that wildlife goals and watershed needs will be satisfied prior to allowing increases in livestock use.

(3) <u>BLM's Authority to Ban or Restrict Grazing</u>: The BLM is granted full authority to ban or restrict grazing without limitation, consistent with law. The BLM shall give extra scrutiny to grazing restrictions and outright bans for certain pastures containing key sage grouse habitat during the periods between June 20 and August 1 (mating and nesting season), and between November 15 and March 1 (when plant growth has ceased for the year).

(4) <u>Stubble Height</u>: As a minimum standard, each permit holder shall conform to the grass residual stubble heights at sage grouse nest-initiation time as identified by Hausleitner et al. (2005) in any pasture that is subject to Management Guideline 1 within the 71 Desert, Pigtail Butte, Cedar Creek, Brackett Bench, Juniper Butte, and Clover Crossing Allotments. The BLM may impose stricter standards on more allotments in its discretion.

(5) <u>Biological Opinion</u>: Permit Holder Brackett Ranches Limited Partnership shall conform to the Biological Opinion on the Effects of Bureau of Land Management

**Memorandum Decision & Order - 15**

Ongoing Livestock Grazing Actions in Idaho on the Slickspot Peppergrass (Lepidium papilliferum) dated January 25, 2010, issued by the U.S. Fish and Wildfire Service.

(6) <u>Burned Areas</u>; The BLM shall implement the 2010 Full Force and Effect Decisions (FFE Decision) and associated Emergency Stabilization and Burn Area Rehabilitation Plans (ESBAR Plan). Grazing shall be closed on those burned portions of the allotments until the prescribed objectives are met, as prescribed by the Full Force and Effect Decisions issued by the BLM.

(7) <u>Consultation</u>: BLM shall consult, cooperate, and coordinate with interested publics, including but not limited to Western Watersheds Projects and Idaho Department of Fish and Game, a draft of the Annual Grazing Plans.

(8) <u>Report to Court</u>: BLM, in consultation with the Permittee, shall provide annual reports to the Court as to the implementation of the IGMPs, as modified herein, after the end of each grazing year, i.e. around March 30th.

(9) <u>Expiration Date</u>: The terms of this modified Judgment shall expire on the date the BLM issues its final grazing permit renewal decision to each of the Permittees, which means that the actual expiration date may vary for each Permittee.

IT IS FURTHER ORDERED, that the motion to strike (docket no. 490) is GRANTED IN PART AND DENIED IN PART. It is granted to the extent it seeks to have filed the rebuttal material attached to the motion. It is denied in all other respects.

IT IS FURTHER ORDERED, that the following motions are DEEMED MOOT

(docket nos. 434, 440, 459 & 491).



DATED:  **July 22, 2011**

_/s/ B. Lynn Winmill_
Honorable B. Lynn Winmill
Chief U. S. District Judge